## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

GILBERT POOLE,

                                 Case No.

    Plaintiff,

                                 Hon.

vs.

CITY OF PONTIAC, a Municipal Corporation,
OFFICER SANTIAGO SERNA,
OFFICER OLIVER MATHES, III,
COUNTY OF OAKLAND, a Municipal Corporation
RICHARD THOMPSON,
CHARLES SPIEKERMAN,
RHONDA C. KLINE f/k/a RHONDA C. ROHTBART,
MELINDA JACKSON &
ALLAN J. WARNICK, D.D.S.,

Individually,

    Defendants.

---

JAMES J. HARRINGTON, IV (P65351)
KEVIN C. RIDDLE (P57435)
Fieger, Fieger, Kenney & Harrington, P.C.
Attorneys for Plaintiff
19390 West Ten Mile Road
Southfield, MI 48075
(248) 355-5555 / (248) 355-5148 - Fax
k.riddle@fiegerlaw.com

---

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

      NOW COMES, Plaintiff, GILBERT POOLE, by and through his attorneys,

FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., and for his Complaint and

Jury Demand against the above named Defendants, hereby states as follows:

## <u>OVERVIEW OF THE CASE</u>

On June 6, 1988, Robert Mejia was tragically murdered. The Government wrongly charged Plaintiff, Gilbert Poole for murder and he was wrongly convicted for this crime.

This case involves the wrongful prosecution and conviction of an innocent man. Gilbert Poole spent over 31 years in prison for the murder of Robert Mejia. A crime he never committed. He was ultimately determined to be completely innocent of the crime with the assistance of the Innocence Project and he was completely exonerated on May 26, 2021. The investigation and prosecution were based on false testimony, fabricated evidence and junk science, which never had a basis.

The City of Pontiac and the Oakland County Prosecutor's Office, through their respective agents, were deliberately indifferent to Gilbert Poole's constitutional rights which resulted in the wrongful conviction. The policies, procedures, training and supervision (or lack thereof) of The City of Pontiac and Oakland County were a moving force behind the constitutional violations. This lawsuit seeks to remedy those constitutional rights that were violated and the injustice of 31 years in prison for a crime he in fact did not commit.

## JURISDICTION

1.    This is a civil action for damages brought pursuant to 42 U.S.C. §§ 1983 and 1998, the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution against Defendants, CITY OF PONTIAC, COUNTY OF OAKLAND, OFFICER SANTIAGO SERNA, OFFICER OLIVER MATHES, III, RICHARD THOMPSON, CHARLES SPIEKERMAN, RHONDA ROHTBART, MELINDA JACKSON, ALLAN J. WARNICK, D.D.S.

2.    Jurisdiction is proper based on the situs of the incident, which occurred in the City of Pontiac, County of Oakland, State of Michigan.

3.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 (a)(3), 1343(a)(4) and 42 U.S.C §§ 1983 and 1998.

4.    That Plaintiff brings this suit against each and every Defendant in both their individual and official capacities.

5.    That each and every act of Defendants, as set forth herein, were done by those Defendants under the color and pretense of the statutes, ordinances, regulations, laws and customs, and by virtue of, and under the authority of the color of law, and such actions were performed in the course and scope of employment of each individual Defendant.

6.    The amount in controversy exceeds One Hundred Million ($100,000,000.00) Dollars, excluding interests, costs and attorney fees.

**VENUE**

7.      Venue lies in the Eastern District of Michigan pursuant to 28 U.S.C §
1391(d), the events took place in the City of Pontiac, County of Oakland, State of
Michigan, which is located within the jurisdiction of the United States District
Court for the Eastern District of Michigan, Southern Division.

**PARTIES**

8.      GILBERT POOLE was convicted of First-Degree Murder on June 6,
1989, and was sentenced to life in prison for the murder of Robert Mejia.  On May
26, 2021, after serving 31 years and 11 months in prison, his conviction was
vacated by Oakland County Judge Rae Chabot, after DNA testing proved he was
not the murderer.

9.      One of the bases of POOLE'S conviction in 1989 was the testimony
of a "bite mark" expert, who testified to statistical identification evidence, which
was knowingly false and without a scientific bases when provided.

10.      There was never a basis for the testimony that was provided.

11.      Additionally, the investigation and prosecution of GILBERT POOLE
was the product of deliberate indifference to his Constitutional rights.

12.      At all times relevant to this lawsuit, Plaintiff, GILBERT POOLE
(hereinafter POOLE), was a citizen of the United States and was entitled to all the

rights, privileges, and immunities accorded to all U.S. citizens and residents of the United States of America.

13.     At all pertinent times, Defendant OFFICER SANTIAGO SERNA, was employed as a police officer by the Pontiac Police Department, a department of the CITY OF PONTIAC, and was acting under color of law.

14.     At all pertinent times, Defendant OFFICER OLIVER MATHES, III, was employed as a police officer by the Pontiac Police Department, a department of the CITY OF PONTIAC, and was acting under color of law.

15.     At all pertinent times, Defendant RICHARD THOMPSON, was the publicly elected prosecuting attorney for Oakland County, and was acting under color of law.

16.     At all pertinent times, Defendant CHARLES SPIEKERMAN, was employed as a prosecuting attorney for Oakland County, and was acting under color of law.

17.     At all pertinent times, Defendant RHONDA ROHTBART, was employed as a prosecuting attorney for Oakland County, and was acting under color of law.

18.     At all pertinent times, Defendant MELINDA JACKSON, was employed as a laboratory scientist by the Michigan State Police, and was acting under color of law.

19.    At all pertinent times, Defendant ALLAN J. WARNICK, D.D.S., was employed as an Expert Forensic Odontologist by the CITY OF PONTIAC and/or COUNTY OF OAKLAND, and was retained by the prosecution to give expert witness testimony in the field of Odontology and was an agent of the prosecution.

20.    At all pertinent times, CITY OF PONTIAC, was a municipal corporation formed under the laws of the State of Michigan, and was the employer of SANTIAGO SERNA and OLIVER MATHES, III. The Pontiac Police Department was an agency of the CITY OF PONTIAC.

21.    At all pertinent times, COUNTY OF OAKLAND, was a municipal corporation formed under the laws of the State of Michigan, and was the employer of RICHARD THOMPSON, CHARLES SPIEKERMAN and RHONDA ROHTBART.

## FACTUAL STATEMENT

## BACKGROUND

22.    The body of Robert Mejia was discovered in the evening of Tuesday, June 7, 1988, in a wooded area behind the apartment he lived in with his mother. He was last seen in public around 2:00 am on Monday, June 6, 1988, when he was leaving Popper's Bar (a gay bar) in Pontiac, Michigan.

23.    Beginning on June 8, 1988, several witnesses were interviewed by the Pontiac Police Department.  Every single witness gave different descriptions of the

person they saw the victim leaving with, and some of the witnesses said they didn't see him leave with anyone at all.

24.     Officer Michael Milosic from Pontiac Police responded to the scene after reports of a body being found by joggers in a wooded area.  Officer Pittman was already on scene.  He said the victim's body was already decomposing, he noted that there was blood all over the victim's clothes, his pants were down below his knees, and he had a gold watch with a black band on.  There were about 5 rocks near the body that had some blood on them.

25.     The medical examiner took fingernail scrapings and clippings, and said the victim was dead for about 36-48 hours prior to her examination.  The victim had 8 stab wounds, with the fatal stab cutting the right carotid artery.  Because of this, the victim would have bled *profusely* and must be a lot of blood at the scene of the murder.  Postmortem scratches on chest and stomach indicated the body was dragged.  The medical examiner indicated that the murder weapon was most likely a pocketknife with a 3-4" blade, ½" width.  The officer obtained fingerprints from the victim.

26.     Officer Albert Rayner received an ID request for services on a missing person.  On 6/7/88, the victim's vehicle was impounded, and he attempted to dust the exterior of the vehicle for fingerprints.  The finish on the exterior of the

vehicle was very rough and no lifts were made from the exterior. He found a pop bottle with a print on it.

27.     On 6/8/88, Warren PD picked Officer Rayner up in a helicopter to take aerial photos of the shopping center where the victim's car was found, the field and surrounding area where the body was found. He was ordered to search the area again for evidence and didn't find anything.

28.     On 6/9/88, Officer Rayner was told by Detective Mathes that Everett Coffelt has been mentioned as a suspect. He did a comparison of fingerprints from the pop bottle he found in the victim's car, and it didn't match Coffelt's fingerprints.

29.     Multiple witnesses identified a Franklin "Hank" Clayton as a known lover to the victim and as one of the men who was with the victim on the night of the murder. Detective Serna interviewed Clayton and searched his truck. Detective Serna found a pocket knife in Clayton's truck which matched the description of the knife used in the murder and took it for evidence.

30.     On 6/16/88, Officer Milosic indicated that Detective Serna gave him a small folding pocketknife that he took from Franklin (Hank) Clayton on 6/10/88, who he says was one of the possible suspects. He and officer Rayner performed the Luminol test on the knife and results were positive but ended up being negative for human blood. The police stopped focusing on Hank Clayton as a suspect.

31.     Gilbert Poole and Connie Cook were living in Pontiac, Michigan and moved to North Carolina in June 1988.  Mr. Poole is from North Carolina and has family there.  He wanted to get away from the drugs in Pontiac, and to hold down a steady job in North Carolina.  Connie and her young son went with Gilbert to North Carolina where they were both able to find jobs and move into a home together.  Gilbert and Connie had been planning to move to North Carolina for quite some time, and there are multiple receipts from U-Haul dating back to May 1988 showing that Gilbert was preparing his vehicle and trailer for the move.

## STATEMENTS BY CONNIE COOK

32.     There were no serious suspects in this case until November 1988, when Connie Cook reported to police in North Carolina that Gilbert confessed a murder to her.  She gave several different accounts of the confession as to when and how the murder took place.

33.     She first told police in North Carolina that the murder happened around Gilbert's birthday, which was in January.  Then in her interview with the police in Pontiac, the date changed to August or September.  In her third interview, she finally offered *June*.

34.     Connie Cook, 23 at the time, provided the following story to Forsyth County Sheriff's Department in North Carolina on November 24, 1988, regarding

Gilbert's confession to her which was allegedly 1-2 months before this interview (which would place the murder between August – October):

> "I don't remember the month, but I remember him saying it happened on the day of his birthday (January) and that was the same night that he had gotten into a fight with me."

> "He (Gilbert) said he was really upset that night from us fighting and he wanted to get out and he wanted to get high, and he wanted to make love to somebody or something.  That's when I found out that he was bisexual.  He told me that night too.  And, he said he went to a gay bar and picked up a guy and went back to his apartment.  He didn't tell me if he had done anything.  And he said that's where it happened, he said that the guy asked him if he wanted to go for a walk and he said sure, and they went for a walk and in the woods, he pulled a knife on the guy and told him to give him his money.  And he wouldn't give him his money.  The guy jumped him, and they fought and struggled, and Gil held him down and slit his throat.  He said he saw the blood gushing right out of his veins, out of his throat.  Then he said he threw the knife, went back to the apartment, and looked for the keys to the guy's car and drove the car back to the bar and hid it in the parking lot.  He said behind the bar, he hid the car.  And then he got in his car and come home."

35.   Connie Cook, provided the following story to Pontiac Police on November 28, 1988:  Connie said she had been bugging Gilbert for months and months, maybe three months, about his missing watch that she bought for him. She says Gilbert got mad at her for continuously asking and that's when, she says, he confessed to killing the victim. She said Poole went to the bar, picked up a

guy, went back to the guy's apartment to do cocaine, then went for a walk in the woods behind the apartment and Gilbert demanded the guy's money. There was a struggle and he slit the guy's throat. She then said Gilbert threw the knife and went back to the apartment to get the keys and to take care of evidence. He couldn't find the keys and went back to get the keys off the victim's body, and went back to the victim's car and drove the victim's car to the bar and parked it in the back.

36.     On November 30, 1988, Connie Cook made another statement to Detectives Mathes and Serna. The police report states, "This tape is being made because of a other tape that was made from Connie Cook. This tape is being made also because of the inconsistency with the prior tape."

37.     Connie Cook states in her November 30, 1988 interview with Detectives Mathes and Serna: Gilbert and her got into a fight in approximately June 1987. The officer corrected her and said 1988. She said he was high and left because he wanted to get more cocaine. She said he left and came home the next morning with scratches on his neck and face, and said he got into a bar brawl. She said the next night he confessed that he murdered somebody. She said he went to a bar off Glenwood at Glenwood Plaza and picked up a gay guy and went back to the victim's apartment to do drugs. Gilbert told her they went for a walk in the woods and there was a struggle over money when Gilbert asked

the victim for his money and the victim refused.  She said Gilbert got him on the ground and slit his throat.  He went back to the apartment to look for the car keys.  Gilbert washed his hands and his face and straightened up the victim's apartment to make sure there was no evidence.  He went back to the victim's body, took the keys, and moved the car to behind the bar and came home.  Gilbert said his watch that Connie had bought for him was in the car.  He brought it in, and Connie says it was covered in blood.  She said Gilbert threatened her.  She says that he then used Connie's jewelry cleaner to clean his watch.

38.    The police said in this interview: "Ms. Cook, earlier you gave us a statement, and we put it on tape.  And it's quite different from this statement.  Earlier you told us he told you this in August or September.  Now you're telling us that he told you this the day or the next day after it happened, in June. Why did you lie to us?"  She replied that she was scared because she waited so long to tell the police and that's why she lied.

39.    Connie Cook testified at trial regarding Gilbert Poole's alleged confession.

40.    Six months had gone by since the murder before Connie Cook initially contacted police.  MATHES testified at trial that there had been some complaints about the length of time of the investigation from the Hispanic

community.  MATHES testified these complaints added more pressure on him to solve the case.

## WITNESSES INTERVIEWED BY PONTIAC POLICE

41.     Kelly Weaver was a resident in the same apartment complex where the victim lived.  She turned over documents to Pontiac Police on one of the victim's friends who also lived in their apartment complex.  Police notes do not say who this friend was.

42.     Victor Negrette was a friend of the victim.  He said he saw the victim about a month prior to the murder.  He gave several names of possible suspects: last name Russell (first name unknown) as someone who was attempting to get the same job as Roberto and there were hostilities between them.  He also named Richard Gonzales as a possible suspect indicating there was a money loan between the two.  Also, Gary Lynch as he and the victim had a big blow up about a year ago.

43.     Basilio Ricardo Gonzales was good friends with the victim.  He testified that Friday, June 3rd was the victim's birthday.  Basilio went to Popper's on Friday at about 1:00 am to give the victim a gift then left and went back to the bar he was originally at.  Saturday evening, he hung out at the victim's house and spent the night.  The next day, Sunday, he and the victim dropped the victim's mother and nephew off at church, then did some shopping and ended up going to

bars around 1:30 pm.  They went to various bars in Detroit and drank about 3-4 drinks at each bar.  They eventually made their way back to Popper's Bar in the evening around 7:30 pm.  Basilio stayed at Popper's until about 12:30 am.   He says he had to drive to Saginaw at 2:00 AM to pick up a check from someone who owed rent payments to him, and to pick up clothes that he needed for a job.  Saginaw is about 2 hours away from Pontiac.  Gonzales said he had to work the next day in the early morning. Police never asked him for blood samples, hair samples or dental impressions.

44.    When the victim's mother was interviewed by police on 6/8/88, she said a lawyer friend of the victim's came over to her apartment around 4:00 pm on Sunday and stayed until about 9:00 pm and cried about the victim.  The victim's mother stated at approximately 5:00 pm – 6:00 pm, this person came over to talk to Gary Lynch and had asked if the victim had a bag with him when he was found.  She told another officer during the investigation that this person asked her if he could look in the victim's room.  Since she thought they were friends, she didn't think anything was wrong, and when he left, he took a bag with him.

45.    Ernesto Mejia was the victim' brother. Says his mother heard the victim come home around 1:30 am and say, "I'm home, mom."  At 2:00 am, she got up and noticed the victim wasn't home and never returned.  Police re-interviewed the victim's brother, Ernesto Mejia who said the lawyer friend's name

was Mike.  He said he was at their apartment the day before, went into the victim's room and was looking for a box of drugs.

46.     Gary Lynch said he last saw the victim with Richard Gonzales around 12:30 pm in the apartment complex.  He said that a person who could be a suspect was Mike Kowal.  He also named Tony Taylor as a suspect/drug dealer. At the time of trial, Gary Lynch testified he knew the victim for about 8 years.  He says they were lovers from 1980-1985, then remained friends from 1985 up to the date that the victim was murdered.  At the time of the murder, Gary Lynch was living in the same apartment complex as the victim.  He saw and talked briefly with the victim the day that he was heading out to Detroit was Basilio.  Gary said that the victim had a habit of taking walks in the field/wooded area behind their apartment complex, and they would often go for walks there.

47.     Basilio Ricardo (Richard) Gonzales told police he hung out with the victim for most of the weekend.  They ended up at Popper's.  Gonzales said that the victim walked out of the bar with a man named Bob, and that the victim got out of Bob's truck after being outside with him.  Bob had a blue pickup truck with a camper on the back.  He said he then saw the victim come back into the bar with a man named Joe.  Basilio left the bar around 1:30 am, leaving the victim at the bar.  He said he had to go to Saginaw that night (approx. 2 hours away).  Suspects named by Basilio were Frank Mazza (used to work for City of Pontiac; victim's

ex-lover who moved back to Pontiac from New York and was going to move in with the victim in the near future), Mike Kowal and Mike Zimmerman.

48.     Police later tried to verify Basilio's statement that he was in Saginaw when the victim turned up missing.  The detectives attempted to contact Theoplis Welch and Mike Lanczynski without success.

49.     On 10/12/88, police administered a polygraph test to Gonzales which he passed.

50.     On 6/10/88, police talked with Mike Kowal (mentioned before by other witnesses).  He had been friends with the victim since 1982.  He said he went to Chicago with the victim on Memorial Day weekend (the weekend prior to the murder).

51.     Michael Brian Sigman. knew the victim for about 6 years.  He stated that Basilio Richard Gonzales would be the most likely suspect.

52.     John Patrick Robinson said he believes that Roberto's brother, Ernesto, is a likely suspect because of some money in the family estate controlled by the victim.

53.     Pontiac Police received a call on 9/1/88 from Millan Holt.  He stated that Mike Saylor (employed at McDonald's) had told him about 2 male subjects who he overheard talking and laughing about the incident:

"Saylor stated he heard these two subjects say Bob Mejia's name and laugh. One then said, "Let's do someone else." He also heard them talk about how they took him out in a car in a field and had a little fun with him, beating him and beating him. They talked about having a little more fun with him and then beating him some more before leaving him in the field."

54. David Alvarado was interviewed by detectives on June 30, 1988. He was not at the bar on June 5th or 6th; however, he told detectives that the victim and Richard Gonzales dropped off someone named Sylvia on June 6, 1988, at 5:30 am. (Connie Cook told police that Gilbert arrived home between 2:30 am and 3:00 am - later changes her story to 1:00 am – 4:00 am at trial). (Gonzales said he had to leave to drive 2 hours to Saginaw that night) David Alvarado was not called to testify at trial.

55. Charles York was a bartender at Popper's Bar. His story about the man the victim left with appearance changed multiple times, as well as what he was drinking that night at the bar. He told police he didn't see any strange vehicles in the parking lot of the bar.

56. Robert Lisk changed his description of the clothing of the man he saw the victim leave with the bar that night. He also told police that he saw the victim leave the bar that night in his own vehicle. He also didn't provide a name of the suspect to the police.

57. Michael DePlaunty said when he saw the victim leave the bar, he was alone. Michael Paul DePlaunty was friends with the victim. He was at Popper's

the night of the murder.  He said that he stayed at the bar until about 1:45 am that night and said that the victim had already left.  He was asked if he saw the victim leave alone, and he said no, he left with a guy.  He was asked if the suspect was still at the bar, and he said "yes."  He also said at some point someone said "there's the whore" when the victim walked into the bar.  He doesn't know who said it.  He said there was a lot of people in the bar that night that he did not know, a lot of new people.  He said that the victim did not leave with the suspect (Gilbert).  He said the bar is not that dark and is pretty well lit.

58.    Franklin (Hank) Clayton told police he and the victim were together at the bar.  He said they left the bar to go to Tony Taylor's house to buy drugs.  They then went back to the bar and said he and the victim did drugs in the parking lot.  He said the victim was noticeably drunk around 11:30 pm.  He told police he was a stranger in the bar who was clean cut, white shirt, and white shorts.  He said the person drank mixed drinks.

59.    James Scherrer was a doorman at Popper's.  He told police he saw the victim leave with two men earlier in the evening; he recognized one of the men as Franklin (Hank) Clayton, but didn't know who the stranger was.  He told police he remembered the victim and the stranger left the bar before 2:00 am in an unknown vehicle.  He saw the victim's car in the lot around 1:30 am.

60.     Kerry Johnson was a bartender at Popper's.  During his interview with police, he said he saw the victim leave with a man named Brian and a scruffy looking person.  ("Brian" is later learned to be Franklin Hank Clayton at trial.)  He recalled all three men stayed at the bar until closing.  He doesn't recall seeing Gilbert Poole at the bar that night.  He gave a statement to police that Hank had blondish-brown collar length hair and a scraggly beard.

61.     Tony Taylor was reportedly a known cocaine dealer to the patrons at Popper's.  He told police he sold drugs to the victim and recalled that the victim was at his apartment twice around 10:30 pm then again at 2:00 am.  When the victim showed up to his home around 2:00 am, he said the victim was pretty drunk and wanted to buy more cocaine.  He says he gave the victim more cocaine and the victim left.

62.     Tony knew the victim for about 5 years prior to his murder.  Tony said the victim and Hank Clayton came to his house the night of the murder and stayed until about 10:30 pm.  Tony was also friends with Hank Clayton.  He said he "believed" they all did "a little bit" of cocaine.  He said he knew that Hank and the victim were going back to Popper's Bar after they left his house.  He was asked if he saw the victim again, and he said yes, that the victim came back to his house around 2:00 am.  He said the victim left some cocaine there, Tony gave it to him,

and the victim left.  He didn't have any further information other than that he knew the victim drove his own car to Tony's house.

63.    Stroud told police he saw the victim speaking with an unknown man at the bar but didn't know what he looked like.  He said that Lisk told him he was in the parking lot when the victim left with the stranger.  He also told police that Tony Taylor told him that the victim went to his house after the bar was closed.

64.    Michael Bridger told police he was at the bar and could identify the suspect if he saw him again.

65.    Robert Lisk was a regular patron of Popper's Bar.  He and the victim were good friends for about 5 years. He said when he arrived at the bar, he saw the victim talking to Hank Clayton and that he knew Hank was a friend that the victim was "going out with."  He and Hank left the bar for about a half hour and then returned.  When the bar was closing, he says the victim and unknown man were leaving together.  Lisk said he didn't trust the person he saw with the victim because he looked like a drifter or belonged to a biker gang.  When asked why he thought that Lisk said because of the way he was dressed in jeans, boots, black leather vest, a red and black checked shirt, and a biker hat (completely different description than any of the witnesses gave of the suspect to the police, and completely different than what Hank Clayton testified to Gilbert's appearance in

trial. It is also completely different than what Lisk told police – Lisk told police that Gilbert was wearing a blue shirt, but then in trial, says biker clothes.)

66.    Lisk testified that he knew that the victim and Hank Clayton were in a relationship.  Lisk did not know Hank prior to the Friday before the incident.  The victim and Hank were together the entire night at the bar.  When the victim and Hank returned from their drive, the victim told Lisk that "he was able to get rid of Hank."  Lisk said that the victim didn't want Hank around him anymore.  The victim introduced Lisk to who he was with and said his name was Lee.

67.    When Lisk was questioned by the police initially, he said he didn't know the suspect's name.  He didn't learn of the name until he read it in the newspaper, and then he told police his name was Lee.  Gilbert's full name is Gilbert Lee Poole.

68.    **<u>No witnesses were ever shown a photo of Gilbert by police, and they were never shown a lineup containing Gilbert as the suspect</u>**.  The first time any identification procedure was conducted with witnesses was in Court at the preliminary exam and then again at trial.  Police failed to ever show witnesses a photo array, nor did they ever do a live lineup while Gilbert was in custody.  The only photos that witnesses may have ever seen of Gilbert prior to trial were in several news articles.

69.     Upon information and belief, the witnesses met at Poppers bar prior to giving their trial testimony.

70.     A reward was offered as evidenced by newspaper articles, offering $2,000.00 for leads leading up to arrest of suspect. When Gilbert's previous attorney, Marla Chicon, hired a PI to interview Connie in 2012, Connie said she got her tax refund from the detectives ($3,000) which was money from the victim's glove box. She denied getting any money from an award though she was aware the family was offering one.

## IDENTIFICATION PROCEDURES

71.     The purpose of identification procedures is to ensure eyewitness identifications be conducted in a manner most likely to asses a witness's true and reliable recollections in compliance with state and federal constitutional requirements.

72.     Testimony concerning a lineup or showup identification is inadmissible if, considering the "totality of the circumstances," the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification. Manson v. Brathwaite, 432 U.S. 98 (1977). Suggestive procedures include when the police tell the witness that they have caught the suspect after which the suspect is viewed alone.

73.   **The first identification attempt by all witnesses in this case was done as an <u>in-court</u> <u>showup</u> identification.**

74.   This suggestive procedure was performed with deliberate indifference to Gilbert Poole's Constitutional rights.

75.   On January 24, 1989, at the preliminary examination hearing, Charles York, a bartender at Popper's identified POOLE as the man who Robert Mejia left the bar with on June 6, 1988 at approximately 1:30AM-1:45AM.  There was a 7-month delay from the night of the murder until the preliminary exam hearing. Charles York had never been shown POOLE in a lineup prior to the hearing.

76.   Rhonda Rohtbart knew this procedure was unreliable and contrary to generally accepted identification standards.  The in-court showup identification without any pre-court lineup was a complete failure to verify that the witness could identify the Defendant and therefore did not constitute a proper eyewitness identification.  The in court show up identification was made in conscious disregard to Gilbert Poole's constitutional rights.

77.   Charles York testified that he was shown 2-3 photographs the day before the victim's funeral.  He didn't make any identification from the pictures and wasn't shown any additional photographs.  He testified that he called Detective Mathes a few months before the preliminary exam and told him he could identify somebody.  Despite this, no law enforcement officer ever showed him a photo

lineup with Gilbert as the suspect.  At trial, his description of Gilbert changed and said he was wearing an aqua blue shirt and some bluish green shorts.

78.    On June 1, 1989, Charles Lisk, a friend of Robert Mejia, testified at trial that he saw POOLE leave Popper's bar on the night of the incident with Robert Mejia.  There was 12-month delay between the night of the murder and the trial. Lisk had never identified POOLE in a lineup prior to trial.

79.    On June 1, 1989, Michael DePlaunty, testified at trial that he saw POOLE at the Popper's bar on the night of the incident. There was 12-month delay between the night of the murder and the trial. Lisk had never identified POOLE in a lineup prior to trial.

80.    On June 2, 1989, Hank Clayton, a man whom Lisk testified was with Mejia at Popper's bar earlier on the night of the incident, testified at trial that he saw POOLE with Mejia on the night of the incident. There was 12-month delay between the night of the murder and the trial. Clayton had never identified POOLE in a lineup prior to trial.

81.    In Hank's statement to police after the incident happened, he told police that he saw the victim leave with somebody who was clean cut.  During trial, he identified Gilbert as the person he saw the victim leave with, although during trial he said that the night of the murder, Gilbert had long hair and a scruffy beard. When he was asked about this during trial, he said he didn't remember

telling police that Gilbert was clean cut the night of the murder. During trial, Hank said he learned of Gilbert's name from the newspaper. Although there were multiple witnesses who said the victim left with Hank, Police never asked Clayton to give blood samples, dental impressions, or hair samples.

82.     This lack of investigation as to Hank Clayton, in light of the fact that Connie Cook lied to police, demonstrates deliberate indifference to Gilbert Poole's Constitutional rights.

83.     There was a 7-month delay between the "stranger encounter" at Popper's bar in earlier June of 1988 to the first identification procedure conducted with Mr. York (in court at the Preliminary Examination in January 1989). For other witnesses, including Mr. Lisk, Mr. Clayton, and Mr. DePlaunty, the delay between their observations and the first time they identified Mr. Poole was nearly 12 months.

84.      It has been a generally accepted principle amongst memory and eyewitness researchers that memory decreases relatively quickly after an event and then continues to decrease with the passage of time. This relationship is known as the "forgetting curve".   Researchers have examined delays of up to 11 months and found significant impairments on accuracy after this time period.

85.     None of the witnesses in this case who identified Mr. Poole in court were informed, prior to their selection, that the stranger seen with Robert Mejia at

Popper's bar on June 5, 1988, may or may not be in the courtroom. Implying in any way to eyewitnesses that the perpetrator is in the identification procedure encourages witnesses to make a selection from the procedure. Instead, eyewitnesses should be told explicitly that the person in question might not be in the showup or photo array or lineup and that they should not feel compelled to make a selection. This pre-identification warning or instruction follows from decades of empirical data showing that eyewitnesses are less likely to identify an innocent suspect when they are warned that the actual culprit might not be present in the procedure.

86.     Mr. York testified at trial that he, Mr. Gonzales and some other witnesses met together in the cafeteria at the courthouse prior to giving their testimony.

87.     Mr. Clayton testified at trial that he had returned to Popper's some time after the murder where he was informed by other witnesses that the police wanted to talk to him.

88.     Upon information and belief, the witnesses congregated at Popper's to discuss their testimony prior to trial.

89.     There was absolutely no justification as to why the first identification procedures conducted with witnesses were in-court showup identifications.

90.     The prosecution was deliberately indifferent to Gilbert Poole's Constitutional rights when it elicited eyewitness identification of Gilbert Poole through means which were impermissibly suggestive.

91.     The effects of a nearly 12-month delay on the witnesses' memories and abilities to make accurate identification decisions of a stranger, coupled with the suggestive in-court showup procedures, demonstrate deliberate indifference to Gilbert Poole's Constitutional rights.

## THE COMPOSITE SKETCHES

92.     In mid-June 1988, two composite sketches created using Identikit were published in the Oakland Press.  These composites were generated based on the description provided by Robert Lisk.  Neither of those two composites were presented at trial as evidence.

93.     During trial, a third composite was revealed.  This is the only composite that was used as evidence at the trial.  There is no police report showing who assisted with creating this composite.  Detective Serna testified at trial that it was created by Lisk within days of the homicide; however, this composite was never published in the Oakland Press, while the other two composites were published.  The two initial composites which were published are significantly different than the composite that was shown at trial.

94.    The composite sketch shown at trial was in the prosecutor's file marked as made at an unknown time.

95.    It appears that the composite shown at trial was drawn from Mr. Poole's North Carolina driver's license photograph which was taken from him at the time of his arrest.  When the prosecutors file was turned over post conviction, the composite was produced with a cropped version of POOLE'S North Carolina driver's license directly behind it. Upon enlarging the composite and the driver's license, it is obvious that they are the same image.  The details of the eye drifting slightly and the corner and shading of the eye are identical.

96.    The composite shown at trial is believed to have been created fraudulently from the driver's license photo in order to mislead the jury about the identification of POOLE.

97.    This fraudulent creation and introduction of evidence of a composite sketch derived from Gilbert Poole's driver's license was done with deliberate indifference to his Constitutional rights.

## BIOLOGICAL EVIDENCE

98.    On September 30, 1988, David Woodford (Laboratory Scientist, Michigan State Police), completed a report documenting his findings on evidence retrieved from the scene of the crime, which included the following items: (1) blood sample from tree south of body; (2) weeds/blood from shoulder area; (3)

weeds/blood from hip area; (4) weeds/blood from area 6' from south of body; (5) four stones in plastic bagging; and (6) two stones collected during the autopsy from the victim, Mr. Mejia's pants and chest.  Mr. Woodford also analyzed Mr. Mejia's fingernails and a knife (from Hank Clayton's truck) that was recovered during the investigation.  Mr. Woodford used the ABO blood group test to type the blood found on the various pieces of evidence.

99.    After his analysis of Mr. Mejia's fingernails, Mr. Woodford "failed to detect anything of immediate evidentiary value."  Mr. Woodford also found no presence of blood on the knife.  For the remaining pieces of evidence, Mr. Woodford's findings showed that the blood found on the weeds near the body and on the stones collected from Mr. Mejia's pants was type O. However, Mr. Woodford discovered that in addition to the type O blood on one of the stones collected from Mejia's pants, there was an additional, foreign blood type present; Type *A Blood* was also present on the same stone.

100.  Mr. Woodford did not type Mr. Mejia's blood during his analyses. Mr. Woodford could not complete ABO typing because he found that the blood sample collected from the autopsy were "hemolyzed and deteriorated."  Woodford only typed the evidence collected from the crime scene.  Importantly, Mr. Woodford's analyses were completed before Mr. Poole was even a suspect in the case.  In fact, no known sample of Mr. Poole's blood was collected until January of

1989.  Because Mr. Poole was not yet a suspect and because Mr. Mejia's blood was not typed, Mr. Woodford did not complete any comparisons of his findings to known samples.

101.  As enumerated in an affidavit for a search warrant, on January 17, 1989, Detective Oliver Mathes spoke with MELINDA JACKSON, Laboratory Scientist for the Michigan State Police. JACKSON indicated that she assisted Mr. Woodford in making his initial evaluation of the physical evidence.  She stated that the blood on the stone recovered from Mr. Mejia's clothing was compared with the known sample of Mr. Mejia's blood and did not match.  **Ms. Jackson indicated that if she was provided a whole blood sample from the suspect (Gilbert Poole), she would be able to compare it with the blood on the stone recovered at the crime scene and determine whether Mr. Poole was the source of the blood on the stone.**  Ms. Jackson also stated that if she was provided with human hair samples from the suspect (Gilbert Poole), she would be able to compare them with the hair recovered from Mr. Mejia's body and determine whether or not they matched Mr. Poole.  Ms. Jackson's statements helped to form the basis of the search warrant and thus Detective Mathes requested blood and hair samples from Mr. Poole.

102.  After Mr. Poole's arrest, the analysis of evidence was reassigned to Ms. Jackson.  On January 27, 1989, Ms. Jackson used ABO serology testing to

type suspected blood found in the console, as well as on a watch and knife that were collected from Mr. Poole's vehicle at the time of his arrest in North Carolina. For the purposes of these analyses, Ms. Jackson used the known sample of Mr. Mejia, which was collected from his shirt during the autopsy, as well as the blood collected from Mr. Poole, per the search warrant, for comparison. Jackson determined that Mr. Poole has type AB blood and Mr. Mejia had type O blood. While a blood type could not be determined on the watch and knife, the blood collected from Mr. Poole's car console was type O.  While the blood found on the console was consistent with Mr. Mejia's blood type, Ms. Jackson testified at trial that it is consistent with 43% of the population.

103.    On March 21, 1989, Ms. Jackson conducted a serological analysis of two Pepsi bottles and a cigarette butt to see if saliva was present. Ms. Jackson did not discover saliva present on these pieces of evidence. She also re-examined the blood found underneath Mr. Mejia's fingernails, which was previously evaluated by Mr. Woodford. She found that out of the ten fingernails, seven had blood underneath that was consistent with Mr. Mejia's blood type (Type O), while the other three could not be quantified.

104.    On May 15, 1989, Ms. Jackson compared five hairs that were obtained from Mr. Mejia's car and hair that was recovered from Mr. Mejia's body to hair that was collected from Mr. Poole.  Ms. Jackson concluded that three of the

hairs were not similar to the known head hairs of either Mr. Poole or Mr. Mejia. The two remaining pieces of hair could not be analyzed without further known samples from Mr. Poole.

105.   In completing her work, Ms. Jackson intentionally and recklessly did not compare any of the evidence she analyzed with the evidence Mr. Woodford analyzed.  Additionally, **Ms. Jackson did not compare the results of the known samples from Mr. Poole and Mr. Mejia to the results of Mr. Woodford's analyses.  Thus, while Mr. Woodford concluded that type A blood was found on the stones that were recovered from Mr. Mejia's body, Ms. Jackson did not document in her reports that Mr. Poole was excluded as the foreign contributor to the stone. Poole has type AB blood and the type found on the stone was Type A.**

106.   Per the search warrant, Ms. Jackson indicated that if she obtained Mr. Poole's whole blood sample, she could compare this with the blood that was found on the stone and she would complete this task.  As previously stated, however, Ms. Jackson did not complete this comparison. If she did, she did not generate a report.

107.   MELINDA JACKSON was deliberately indifferent to Mr. Poole's constitutional right by failing to complete this comparative which would have excluded Gilbert Poole.

108.   During trial, on May 30, 1989, Mr. Woodford was withdrawn as a testifying witness. The prosecutor, Mr. Charles Spiekerman, stated on record:

> Dr. David Woodford, Your Honor, is extremely ill and he's not available to testify, and we have had many of his reports recreated by another doctor, Melinda Jackson, who has been added as a witness by stipulation earlier.

109.   Ms. Jackson was called to testify at trial on June 5, 1989. Ms. Jackson did not in fact "recreate" the reports of Mr. Woodford, as indicated by Mr. Spiekerman.  As previously explained and illustrated by each lab report, the only evidence that was examined by both Mr. Woodford and Ms. Jackson was the blood found underneath Mr. Mejia's fingernails.  Other than this piece of evidence, Ms. Jackson actually analyzed different pieces of evidence and in no way referenced the work of Mr. Woodford. From information in the case, the prosecutor knew the blood type on the stones did not match POOLE. This mischaracterization of evidence and failure to present exculpatory evidence constitutes a deliberate indifference to POOLE's Constitutional rights.

110.   On direct examination, Ms. Jackson confirmed each test that she had conducted.  On cross examination, when asked if she conducted an analysis on stones that were collected from Mr. Mejia's person, Ms. Jackson responded with "[n]o, I did not."  Defense attorney Wilhem followed his inquiry by asking Ms. Jackson if she knew if an examination of the stones was done, to which Ms.

Jackson responded by stating, "I believe they were, yes." Mr. Wilhem then asked if the test would have been done by Mr. Woodford, and Ms. Jackson responded by stating "David Woodford." After identifying David Woodford as the analyst that conducted an examination on the stones, Ms. Jackson did not testify to any of Mr. Woodford's findings or analyses.

111.   The prosecutor failed to state that no testing had been performed which could link POOLE to the stones and that testing was done that was exculpatory.

112.   During Mr. Spiekerman's closing argument, he briefly mentioned Mr. Woodford's report and stated that "his [Mr. Woodford] report is also significant because it does talk about some of the blood types on the stones; and it all matches Bob Mejia's blood type."  The prosecutor completely intentionally and recklessly mischaracterized results of the lab testing done by Woodford. The results showed that Gilbert Poole's blood was not on any of the stones.

113.   Daniel Fournier worked for the Oakland County Sheriff's Department for 16 years at the point of trial.  During the time of the murder, he was assigned as the crime lab specialist.  His area of expertise was fingerprints and processing the crime scene. MATHES and SERNA, had him look at the victim's 1978 blue BMW.  He recovered the victim's wallet from the glove box and said it contained $64.  Fournier said he obtained latent lifts of fingerprints in this victim's vehicle.

At trial he was asked if he made comparisons of fingerprints, and he said he does, but did not in this case.   All the latent lifts were handed over to City of Pontiac.

114.   According to an Affidavit signed by Karl Riech, PhD, the data from the original blood antigen analysis and the data from the more recent DNA profiling analysis are consistent: POOLE is excluded as a contributor to all tested samples and there is evidence of an unknown contributor who is not POOLE or the victim.

115.   Ms. Jackson was late on the day of her trial testimony. When the Court asked why she was late, she stated she received a call at the lab about 8:00 and then they called back to have her check the evidence room for some property that was missing.  The Court asked, "In this case?"  Ms. Jackson replied, "Yes, and then I checked our evidence room, checked the paperwork, and got dressed and came here." There was no further inquiry into the property that was missing from the evidence room.

116.   The rush to prosecute Gilbert Poole was done in deliberate indifference to his Constitutional rights.

## PONTIAC POLICE TRIAL TESTIMONY

117.   During Detective Santiago Serna's testimony, he said that there were other detectives in charge of this case, but they were taken off of it.   It was reassigned to him and Mathes.  When the case was assigned to him, he said the

first things he tried to do was get all the reports. He said "they were scattered about. Many detectives had something to do with it, and I was trying to get the reports." He checked multiple vehicles for a sandy like substance underneath the carriage. He checked the victim's vehicle and did not find any sandy-like substance. When he looked through Hank Clayton's vehicle, he found a pocketknife (when police interviewed Hank Clayton, he said he did not own a knife). He didn't take any pictures of Hank Clayton's truck.

118. During Detective Serna's testimony, he admitted that all of the witnesses had different descriptions of the suspects appearance – some said stubble, some said bushy beard, others said long hair, others said clean cut.

119. During trial Detective Raynor, the evidence technician was shown photographs that he took of the scene on June 8, 1988, the day after the body was found. He collected blood found from north and south side of the bush near where the body was. He processed the victim's car, inside and out, for fingerprints. He said there were no fingerprints. (Officer Fournier said he obtained fingerprints from the victim's car). He concluded that the victim was killed in one location then dumped into the field. He said there wasn't much blood at the scene. He found about four rocks that had a small amount of blood on them. He did not find any blood anywhere in the victim's car. When he tested the knife from Hank

Clayton using the luminal tests which detects iron which is found in blood, it was positive.

120.   Officer Mathes, the officer in charge of the Pontiac investigation testified at trial he had been an officer for about 16 years at the time.  Assigned to detective bureau for about two ½ years.  He was the officer in charge of this investigation, and admits he has the responsibility of overseeing what the other officers are doing. He said in November the case was still open (murder happened beginning of June), when they heard from police in North Carolina indicating Connie Cook had called them indicating someone confessed a murder to her.  He inspected vehicles of Richard (Basilio) Gonzalez and Gary Lynch for mud, dirt, etc.  He didn't find anything.  He did not inspect any other vehicles.  He never interviewed Hank Clayton.  He didn't take blood samples from anyone.  Nobody under his supervision took blood samples from anyone.  He did not request dental impressions made of anyone other than for Gilbert Poole. He was questioned about the knives they have in evidence concerning this investigation.  He said the only knife he is aware of is the knife he obtained from Gilbert Poole's mother's house. When asked if he is aware of the knife that Detective Serna retrieved from Hank Clayton's truck, he said he isn't aware of that knife.

121.   Officer Mathes testified at trial that there had been multiple complaints about the length of time of the investigation from the Hispanic community.  He admitted this put more pressure on him to solve the case.

122.   Edward Pittman was an officer for the Pontiac Police for about 13 years at the time of trial.  He testified that he was working with his partner Bill Pummill.  While on shift they received a call about a dead body.  He stayed at the scene while the EMS checked for vitals, which there weren't any.  Once they left, he said he stayed at the scene until the medical examiner picked up the body, which he says was approximately 7 hours.  He didn't examine the scene.

123.   Gary Clark was a Pontiac Police Officer who took a report of a missing person on June 6, 1988, at about 8:30 pm from the victim's mother and brother. He testified that he located the victim's car behind the strip mall / plaza where Popper's bar was located.  The car's windows were rolled down, and everything was in place.  There were no signs of a struggle or anything in disarray. He preserved the car for prints.

**<u>BITEMARK EVIDENCE</u>**

124.   On June 9th, 1988, Dr. Allan Warnick was called to the Oakland County Medical Examiner's Office by Dr. Linda Biedrzycki, the physician who conducted the autopsy of Mr. Robert Mejia. Upon Dr. Warnick's arrival, he was asked to examine a mark on the upper right arm of Mr. Mejia. Dr. Warnick found

that the mark was consistent with "the arch form of an adult human dentition." From this observation, Dr. Warnick concluded that this mark was a bite mark, and he proceeded to incise the tissue around the mark (cut the flesh surrounding the mark and remove the sample from the body); the sample was stored in a preservative fluid. Two impressions were made from the incised tissue and stored.

125.   In December 1988, Mr. Poole was arrested for the murder. On January 18, 1989, Pontiac Police Department Detective Oliver Mathes contacted Dr. Warnick to perform a dental examination on Gilbert Poole. Dr. Warnick took dental impressions from Mr. Poole.

126.   In MATHES affidavit for search warrant, he stated that Dr. Warnick, if provided with photographs, dental impressions, bite registration and dental charting of a suspects oral structure from Gilbert Poole, he would be able to determine whether or not the suspect was the source of the bitemark.

127.   On March 9, 1989, Dr. Warnick worked up the excised mark and compared it to Mr. Poole's dental work and concluded that with reasonable dental certainty, the mark on Mr. Mejia's arm was created by Gilbert Poole.

128.   On June 2, 1989, Dr. Warnick testified at Mr. Poole's trial that *the odds that two people would make the same bitemark is 2.1 billion to 1.* Dr. Warnick also testified that the bitemark was consistent with Gilbert Poole's dentition. **Dr. Warnick was deliberately indifferent to POOLE's Constitutional**

**rights in knowingly giving false testimony of statistical evidence which had no**

**scientific support.**

129.   At trial, Dr. Warnick testified that the American Board of Forensic Odontology "point system" for identification, by directive from the Board, is not being used and should not be brought into court because its very subjective.  He further testified "Some would look at it and you give a point for uniqueness to certain areas, and I might look at one way and you might look at it a little bit different. So there is some subjectivity."

130.   Charles Spiekerman stated in his closing arguments at trial that "the foremost bite mark expert in this part of the country says those teeth bit the victim."

131.   At trial, Dr. Warnick was asked by Defense attorney whether the fact that there was another person who had a knife, if it would have changed his opinion on whether the dental impression was accurate – he said it was up to the police to determine that.

132.   According to Detective Rayner's trial testimony, the victim's body was found clothed in a long-sleeve shirt.  The tissue excised for bitemark workup by Dr. Warnick was taken from the upper right arm of the victim. Unlike, fingerprinting, a bitemark is not a latent image transfer. A bitemark is susceptible to tissue distortion.  A bitemark made through clothing will not allow an accurate

transfer to the skin.  The opinion testimony by Dr. Warnick to the contrary was unscientific, knowingly false, and proffered by the prosecution.

133.   Dr. Warnick has been discredited in a number of cases.

134.   Bitemark comparison is not recognized as a scientific means for linking a particular individual to a crime scene.

135.   SERNA and MATHES, as sworn police officers, had taken an oath, the Law Enforcement Code of Ethics, that stated, in pertinent part: "*As a sworn police officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation and the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality and justice*."

136.   SERNA, MATHES, JACKSON, SPIEKERMAN, KLINE and THOMPSON ran afoul of the United States Supreme Court's recognition of the "*fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free*." In re Winship, 397 U.S. 358, 372; 90 S.Ct. 1068, 1077; 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). See also T. Starkie, Evidence 956 (1824) ("*The maxim of the law is ... it is better that ninety-nine ... offenders should escape, than one innocent man should be condemned*").

## POST CONVICTION PROCEDURAL HISTORY

137.   On January 21, 1993, the Court of Appeals affirmed Poole's conviction.   The Court did not address the due process violation by the prosecutor's inflammatory closing argument.

138.   June 25, 1993, POOLE's Application for Leave to Appeal was denied by the Michigan Supreme Court.

139.   On August 27, 1993, POOLE's motion for reconsideration was denied.

140.   On August 1, 2006, POOLE's delayed motion for new trial based on newly presented evidence which was treated as a MCR 6.500 motion, requesting DNA testing based on MCL 770.16, was denied.

141.   On October 23, 2007, POOLE's motion for leave to appeal was denied.

142.   On April 28, 2008, the Michigan Supreme Court denied leave for appeal.

143.   On November 28, 2011, POOLE was denied writ of habeaus corpus.

144.   On November 2, 2012, POOLE petitioned for DNA Testing and Search for Biological Material under MCL 770.16. This petition was denied on November 28, 2012. Judge Chabot found that evidence was not material since Poole was already excluded on blood-typing.

145.   On April 9, 2013, POOLE's motion for reconsideration was denied.

146.   On November 25, 2013, POOLE's motion for leave to appeal is granted.

147.   On September 2, 2014, The Court of Appeals affirmed, noting the Circuit Court did not have the authority to grant testing.

148.   On May 20, 2015, Michigan Supreme Court held that the Court of Appeals must consider the merits of Poole's request for testing, noting law of the case doctrine does not apply.

149.   On July 7, 2015, the Court of Appeals reversed and remanded for DNA testing, holding that the evidence is material to the identity of the perpetrator.

150.   On September 1, 2015, the Oakland County Prosecutor filed leave to appeal. The leave was denied by Michigan Supreme Court on November 25, 2015.

151.   On  January 13, 2016, DNA testing was ordered by Judge Chabot.

152.   Poole was finally exonerated on May 26, 2021.

### COUNT I
### CITY OF PONTIAC & COUNTY OF OAKLAND CUSTOMS AND POLICIES THAT LED TO PLAINTIFF'S WRONGFUL CONVICTION- MONELL LIABILITY

153.   In and before December 27, 1988, the date of Plaintiff's arrest, the CITY OF PONTIAC & COUNTY OF OAKLAND, by and through their final policymakers, had a custom and policy to authorize, condone, tolerate and approve

illegal and unconstitutional actions by the prosecutor's office, police department officers, laboratory employees and command staff.

154.   At all times relevant hereto, Defendants failed to train, discipline and supervise their officers and prosecutors and/or encouraged the officers and prosecutors to violate federal and state laws without regard to the constitutional rights of citizens to be free from violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

155.   At all times relevant hereto, Defendants refused to provide the officers and prosecutors any training, discipline and supervision with regard to the constitutional rights of citizens to be free from violations of the Fourth, Eighth and Fourteenth Amendments to the United States Constitution; refused to provide the officers and prosecutors with supervision and discipline to protect the constitutional rights of citizens; refused to require the officers and prosecutors to follow policies and procedures and state and federal law relating to the right of due process.

156.   At all times relevant hereto, Defendants knew, or should have known, that the policies, procedures, training supervision and discipline of the officers and prosecutors were inadequate for the tasks that each Defendant was required to perform.

157.   The illegal and unconstitutional actions and practices included but were not limited to:

1.   Conducting a Constitutionally inadequate investigations into serious felony cases, such as murder, in order to expeditiously close cases, and affirmatively choosing not to develop or pursue actual leads or evidence;

2.   Knowingly and deliberately fabricating evidence in order to manufacture probable cause to arrest and/or strengthen a case for conviction;

3.   Knowingly and deliberately choosing not to conduct formal tests and identification procedures because investigators knew that the results would contradict evidence against their target suspect.

4.   Knowingly and deliberately choosing to proffer fraudulent testimony.

5.   COUNTY OF OAKLAND further delayed pursuing a reversal in POOLE'S conviction in light of the knowledge that foundational evidence was invalid, unreliable and could not support a conviction.

158.   Defendant, CITY OF PONTIAC & COUNTY OF OAKLAND, through their final policymakers, further maintained a custom and policy of failing to adequately train, supervise, and/or discipline officers concerning proper and constitutionally adequate evidence collection, analysis, and disclosure, including their duty not to fabricate evidence and to disclose apparent exculpatory and impeachment evidence.

159.   CITY OF PONTIAC & COUNTY OF OAKLAND'S customs and policies, set forth above, demonstrated deliberate indifference to the constitutional

rights of their citizens, including GILBERT POOLE, and were the moving force behind the individual Defendants' constitutional violations.

160.  Due to the conduct of Defendants, as set forth above, Plaintiff, GILBERT POOLE, suffered the following injuries and damages:

  a. Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over 31 years, including significant time spent in solitary confinement;

  b. Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charges with First Degree Murder/Felony Murder, facing a sentence of Life in Prison without the possibility of parole; and being wrongfully convicted of crimes the Defendants knew he did not commit;

  c. Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

  d. Fright, shock, indignity, humiliation, outage, indignity and embarrassment of being wrongfully charged and imprisoned for murder;

  e. Loss of enjoyment of daily activities;

  f. Not being able to attend the funerals of family members, including both his parents;

  g. Physical injuries suffered in prison;

  h. Future medical expenses including psychiatric care;

  i. Loss of employment opportunity, past income and future earning capacity;

j.   Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, recreational activities, and personal expression;

k.   Many of Plaintiff's injuries and damages are likely to be permanent;

l.   Exemplary, compensatory, and punitive damages allowed under Michigan and Federal law;

m.  Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988;

n.   The costs and disbursements of this action pursuant to 42 U.S.C. §1920;

o.   All damages allowed under MCL 600.2907 and the common law of the State of Michigan, together with pre-judgment interest, costs and attorney fees allowed under state law; and

p.   Such other and further relief as appears just and proper.

161.   Due to the conduct of Defendants, as set forth below, the true killer has never been caught and the victim's family has never received true closure.

## COUNT II
## 4th and 14th AMENDMENT "FABRICATION OF EVIDENCE BY DEFENDANTS MATHES & SERNA

162.   Plaintiff incorporates by reference each preceding paragraphs as if fully stated herein.

163.   At all times, Plaintiff had a constitutional right, secured by the 4th and 14th Amendments, not to be seized and deprived of liberty as a result of fabrication of evidence by a government officer acting in an investigative capacity.

164.   At all times, Plaintiff had a constitutional right, secured by the 14th Amendment, not to be deprived of due process as a result of fabrication of evidence by a government officer, including a police officer, acting in an investigative capacity.

165.   Plaintiff's constitutional 4th Amendment and due process rights to be free from illegal seizure and continued detention based upon fabrication of evidence by a government official acting in an investigatory capacity was clearly established before June 6, 1988, the earliest possible date for Defendants' conduct in this case. *Albright v. Oliver*, 510 U.S. 266, 274; 114 S. Ct. 807; 127 L.Ed.2d 114 (1994)(malicious prosecution of an individual and continued detention of an individual without probable cause clearly violate rights afforded by the Fourth Amendment, citing cases back to the 1940s); *See also Napue v. Illinois*, 360 U.S. 264, 269; 79 S.Ct. 1173 (1959) (14th Amendment right not to be deliberately subjected to trial based on false evidence is implicit in any concept of ordered liberty.")

166. MATHES and SERNA deliberately and knowingly fabricated evidence in order to manufacture probable cause and secure a conviction.

MATHES and SERNA'S fabrication of evidence included securing false witness identification by Connie Cook, who made inconsistent statements regarding POOLE'S alleged confession to her.

167. MATHES and SERNA deliberately and knowingly fabricated evidence in order to secure a conviction by creating a composite sketch, not generated by any witness statements but instead generated from GILBERT POOLE'S driver's license photo after his arrest.

168. MATHES and SERNA'S deliberate and knowing fabrication of evidence to continue POOLE'S detention caused a violation of his right to be free from illegal seizure and continued detention and resulted in his wrongful conviction and imprisonment from June 6, 1989, to his exoneration on May 26, 2021; a period of 11,677 days; or 31 years, 11 months, 20 days; or 383 months and 20 days.

169. Plaintiff's total time spent behind bars in jail and prison totaled 11,838 days; or 32 years, 4 months, 29 days; or 388 months and 29 days.

170. Plaintiff's cause of action for fabrication of evidence became complete when the criminal case against him was terminated in his favor with charges being dismissed on May 26, 2021. *See McDonough v. Smith*, -- U.S. --; -- S.Ct. --; 2019 WL 2527474 (June 20, 2019).

171. Due to the conduct of Defendants, as set forth above, Plaintiff,

GILBERT POOLE, suffered the following injuries and damages:

    a. Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over 31 years, including significant time spent in solitary confinement;

    b. Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charges with First Degree Murder/Felony Murder, facing a sentence of Life in Prison without the possibility of parole; and being wrongfully convicted of crimes the Defendants knew he did not commit;

    c. Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

    d. Fright, shock, indignity, humiliation, outage, indignity and embarrassment of being wrongfully charged and imprisoned for murder;

    e. Loss of enjoyment of daily activities;

    f. Not being able to attend the funerals of family members, including both his parents;

    g. Physical injuries suffered in prison;

    h. Future medical expenses including psychiatric care;

    i. Loss of employment opportunity, past income and future earning capacity;

    j. Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal

fulfillment, sexual activity, family relations, recreational activities, and personal expression;

k.  Many of Plaintiff's injuries and damages are likely to be permanent;

l.  Exemplary, compensatory, and punitive damages allowed under Michigan and Federal law;

m. Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988;

n.  The costs and disbursements of this action pursuant to 42 U.S.C. §1920;

o.  All damages allowed under MCL 600.2907 and the common law of the State of Michigan, together with pre-judgment interest, costs and attorney fees allowed under state law; and

p.  Such other and further relief as appears just and proper.

## COUNT III
## 4th AMENDMENT MALICIOUS PROSECUTION
## BY DEFENDANTS MATHES, SERNA, THOMPSON, SPIEKERMAN & ROHTBART

172.  Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

173.  At all times, Plaintiff had a clearly-established constitutional right, secured by the 4th Amendment, not to be seized and deprived of liberty as a result of fabrication of evidence and knowingly-made false statements or material omissions by a government officer, including a police officer, acting in an investigative capacity in order to manufacture probable cause. *Franks v. Delaware*,

438 U.S. 154; 98 S.Ct. 267; 457 L.Ed.2d 667 (1978); *Mills v. Barnard*, 869 F.3d 472, 480 (6th Cir. 2017) ("The prototypical case of malicious prosecution involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person.")

174. Defendants, MATHES, SERNA, THOMPSON, SPIEKERMAN & ROHTBART influenced or participated in the in the initiation of criminal prosecution when they deliberately and knowingly fabricated evidence to secure Plaintiff's arrest and continued detention. MATHES and SERNA further influenced the prosecution when they stated to Forsyth County Sheriff that Connie Cook told them, "Gilbert Lee Poole, Jr. told her that he had killed a person on or about the 7th day of June, 1988, in Pontiac, Michigan," which was used in the Forsyth County application for search warrant, dated January 11, 1989, and was material to finding probable cause.

175. Defendants, MATHES, SERNA, THOMPSON, SPIEKERMAN & ROHTBART further influenced or participated in the initiation of criminal prosecution and Plaintiff's continued detention when they knowingly omitted material facts (that Connie Cook initially stated she could not remember when the murder occurred and in her second statement, stated the murder occurred in January of 1988, the night of POOLE's birthday) in their warrant request to the warrant prosecutor and judge who signed the arrest warrant.

176.   But for Defendants' fabrication of evidence and false statements and material omissions on the warrant request, statements to the prosecutors and the judge who signed the arrest warrant, probable cause would have been lacking; such conduct constituting a claim of federal "malicious prosecution" under the 4th Amendment.

177.   Plaintiff suffered a deprivation of liberty in excess of 31 years because of Defendant's conduct.

178.   Plaintiff's cause of action for federal malicious prosecution became complete when the criminal case against him was terminated in his favor with charges being dismissed on May 26, 2021.

179.   Plaintiff's constitutional right to be free from illegal seizure and continued detention without probable cause based upon fabrication of evidence, knowingly-made false statements and/or omissions of materials facts by a governmental official acting in an investigatory capacity, including police officers, was clearly established before May 9, 1999, the earliest possible date for police misconduct. *Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir. 1989) ("[A]n officer cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant.").

180. Defendants' deliberate false statements and deliberate and/or reckless omissions of material facts was not intended to bring to justice the true perpetrator of the crime. Instead, Defendants' conduct was intended to secure Plaintiff's arrest and conviction because they felt pressured by the community to solve the case.

181. Defendants' intentional and/or reckless conduct was a direct and proximate cause of Plaintiff's pre-conviction deprivation of liberty and continued detention from his arrest on December 27, 1988, to his conviction on June 6, 1989; a period of 161 days, or 5 months and 10 days.

182. Defendants' intentional and/or reckless conduct as described above was a direct and proximate cause of Plaintiff's wrongful conviction and imprisonment from June 6, 1989, to his exoneration on May 26, 2021; a period of 11,677 days; or 31 years, 11 months, 20 days; or 383 months and 20 days.

183. Plaintiff's total time spent behind bars in jail and prison totaled 11,838 days; or 32 years, 4 months, 29 days; or 388 months and 29 days.

184. Due to the conduct of Defendants, as set forth above, Plaintiff, GILBERT POOLE, suffered the following injuries and damages:

    a. Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over 31 years, including significant time spent in solitary confinement;

    b. Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charges with First Degree Murder/Felony Murder, facing a sentence of Life in

Prison without the possibility of parole; and being wrongfully convicted of crimes the Defendants knew he did not commit;

c.  Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

d.  Fright, shock, indignity, humiliation, outage, indignity and embarrassment of being wrongfully charged and imprisoned for murder;

e.  Loss of enjoyment of daily activities;

f.  Not being able to attend the funerals of family members, including both his parents;

g.  Physical injuries suffered in prison;

h.  Future medical expenses including psychiatric care;

i.  Loss of employment opportunity, past income and future earning capacity;

j.  Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, recreational activities, and personal expression;

k.  Many of Plaintiff's injuries and damages are likely to be permanent;

l.  Exemplary, compensatory, and punitive damages allowed under Michigan and Federal law;

m.  Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988;

n. The costs and disbursements of this action pursuant to 42 U.S.C. §1920;

o. All damages allowed under MCL 600.2907 and the common law of the State of Michigan, together with pre-judgment interest, costs and attorney fees allowed under state law; and

p. Such other and further relief as appears just and proper.

**COUNT IV**
**14th AMENDMENT DUE PROCESS**
**"BRADY" VIOLATIONS BY DEFENDANTS MATHES & SERNA**

185. Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

186. At all times, Plaintiff had a constitutional right, secured by the 14th Amendment, not to be deprived of due process as a result of the withholding of material exculpatory or impeachment evidence by a government officer.

187. Defendants MATHES and SERNA deliberately and knowingly chose not to disclose material exculpatory and impeachment evidence in their files in violation of their constitutional obligation under *Brady v Maryland*, 373 U.S. 83 (1963) and its progeny, which would have resulted in no arrest warrant being issued, or a finding of lack of probable cause at the preliminary exam or an acquittal at trial; such conduct constituting a claim for a due process "*Brady* violation" under the 14th Amendment.

188.   MATHES and SERNA deliberately and knowingly rehabilitated Connie Cook's version of events by providing her information to adjust her statement to fit with the theory favored by the prosecution, which was material to a finding of probable cause.

189.   MATHES and SERNA deliberately and knowingly participated in the creation of a fraudulent composite sketch based on Gilbert Poole's driver's license which was presented at trial as a legitimate composite assisted by Robert Lisk.

190.   Plaintiff's right to *Brady* evidence, and the police officer's constitutional duty to turn over material and apparent *"Brady"* evidence, was clearly established before June 6, 1989, when he was tried and convicted. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Moldowan v. City of Warren*, 578 F.3d. 351, 382 (6th Cir. 2009) (citing cases back to 1964).

191.   MATHES and SERNA's knowing and intentional due process violations was a direct and proximate cause of Plaintiff's wrongful conviction and imprisonment from June 6, 1989, to his exoneration on May 26, 2021; a period of 11,677 days; or 31 years, 11 months, 20 days; or 383 months and 20 days.

192.   The total time Plaintiff spent behind bars totaled 11,838 days; or 32 years, 4 months, 29 days; or 388 months and 29 days.

193.   Due to the conduct of Defendants, as set forth above, Plaintiff, GILBERT POOLE, suffered the following injuries and damages:

a. Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over 31 years, including significant time spent in solitary confinement;

b. Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charges with First Degree Murder/Felony Murder, facing a sentence of Life in Prison without the possibility or parole; and being wrongfully convicted of crimes the Defendants knew he did not commit;

c. Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

d. Fright, shock, indignity, humiliation, outage, indignity and embarrassment of being wrongfully charged and imprisoned for murder;

e. Loss of enjoyment of daily activities;

f. Not being able to attend the funerals of family members, including both his parents;

g. Physical injuries suffered in prison;

h. Future medical expenses including psychiatric care;

i. Loss of employment opportunity, past income and future earning capacity;

j. Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, recreational activities, and personal expression;

k. Many of Plaintiff's injuries and damages are likely to be permanent;

l.  Exemplary, compensatory, and punitive damages allowed under Michigan and Federal law;

m. Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988;

n.  The costs and disbursements of this action pursuant to 42 U.S.C. §1920;

o.  All damages allowed under MCL 600.2907 and the common law of the State of Michigan, together with pre-judgment interest, costs and attorney fees allowed under state law; and

p.  Such other and further relief as appears just and proper.


## COUNT V
## VIOLATIONS OF 6th AMENDMENT RIGHT TO CONFRONT WITNESSES AND 14th AMENDMENT RIGHT TO DUE PROCESS AGAINST DEFENDANTS RICHARD THOMPSON, CHARLES SPIEKERMAN, & RHONDA ROHTBART

194.  Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

195.  At all times, Plaintiff had a constitutional right, secured by the 6th Amendment, to confront witnesses against him and the 14th Amendment, not to be deprived of due process as a result of the suppression of evidence favorable to and requested by an accused, where the evidence is material to either guilt or punishment, irrespective of good or bad faith of the prosecution.

196.   Defendant RICHARD THOMPSON, CHARLES SPIEKERMAN & RHONDA ROHTBART, as counsel for the People, deliberately and knowingly submitted a composite sketch as an exhibit at trial, purporting it to have been generated by the testimony of Lisk and printed in the Oakland County Press, when it was in fact not the composite sketch that was generated by Lisk and printed in the Oakland County Press, but a new composite sketch never produced to the Defendant before trial. During the prosecutor's closing statement, he stated, "It nails him – that composite nails him," while deliberately misrepresenting it to be the composite that appeared in the Oakland County Press. This can only be deemed as false evidence that was presented to the jury.

197.   It is well established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under Fourteenth Amendment protections. *Napue v. Illinois*, 360 U.S. 264; 79 S.Ct. 1173 (1959).

198.   The prosecutor's comments in closing arguments went beyond the scope of permissible comment on the evidence presented. Instead, the comment amounted to new evidence presented against the Defendant. As such, it was testimony presented by the Prosecutor against Defendant. Testimony given by a prosecutor is impermissible because it defeats a defendant's right to cross examine

witnesses presented against him, thus violating defendant's 6th Amendment right to confront witnesses against him.

199.   Defendant RICHARD THOMPSON, CHARLES SPIEKERMAN & RHONDA ROHTBART, as counsel for the People, deliberately and knowingly misrepresented David Woodford's lab report findings at trial when the prosecution stated in closing arguments, "His report is also significant because it does talk about some of the blood types on the stones; and it all matched Bob Mejia's blood type."  David Woodford's report, which was done prior to POOLE'S arrest, in fact identified both Type O blood and Type A blood on the stones. POOLE's blood was later determined to be Type AB by MELINDA JACKSON.

200.   Defendant RICHARD THOMPSON, CHARLES SPIEKERMAN & RHONDA ROHTBART, as counsel for the People, further deliberately and knowingly misrepresented MELINDA JACKSON'S report as a "recreation" of David Woodford's report in his statement on the record at trial to excuse David Woodford from testifying.  MELINDA JACKSON did not in fact recreate David Woodford's tests but performed new tests altogether. She did not perform tests on the stones and she did not testify to any of David Woodford's findings relative to the stones. The prosecutor's misrepresentation of MELINDA JACKSON'S report falsely rendered David Woodford's report redundant to the jury.

201.   Since Mr. Woodford was excused as a witness on the day of trial, the defendant was unable to cross examine him and illicit the testimony which would have excluded POOLE as the contributor to the only other foreign blood type found at the crime scene.

202.   The Confrontation Clause, providing that accused has right to confront and cross-examine witnesses against him, applies not only to in-court testimony but also to out of court statements introduced at trial, regardless of admissibility of statements under law of evidence. Out-of-Court statements by witnesses that are testimonial are barred, under the Confrontation Clause, unless witnesses are unavailable and defendants had prior opportunity to cross-examine witnesses, regardless of whether such statements are deemed reliable by Court; where testimonial statements are at issue, only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes, i.e., confrontation. *Crawford v. Washington*, 541 U.S. 36; 124 S.Ct. 1354 (2004).

203.   The notes and laboratory report of a non-testifying crime lab serologist were "testimonial."

204.   The hearsay report of serologist Mr. Woodford, that was introduced as evidence against Defendant, and relied upon by the Prosecutor in his closing arguments, denied Defendant his Confrontation Rights. "State's presentation of witness's deposition with defendant's counsel consent, but without defendant's

consent, violated defendant's confrontation rights, thus warranting habeas corpus relief." Clemmons v. Delo, 124 F.3d 944 (8th Cir. 1997).

205.  Defendant RICHARD THOMPSON, CHARLES SPIEKERMAN & RHONDA ROHTBART, as counsel for the People, deliberately and knowingly elicited improper eyewitness identification testimony through means which were impermissibly suggestive.  The first time any eyewitness identified POOLE was at his preliminary hearing, where he stood as the lone defendant in a murder trial. No lineup identifications were conducted prior to the preliminary hearing or trial. It has been well documented that showup identifications, where a single person is presented to a witness for the purpose of identification, are inherently suggestive.

206.  Defendants' intentional and/or reckless conduct as described above was a direct and proximate cause of Plaintiff's wrongful conviction and imprisonment from June 6, 1989, to his exoneration on May 26, 2021; a period of 11,677 days; or 31 years, 11 months, 20 days; or 383 months and 20 days.

207.  Plaintiff's total time spent behind bars in jail and prison totaled 11,838 days; or 32 years, 4 months, 29 days; or 388 months and 29 days.

208.  Plaintiff's cause of action for violations of his 6th Amendment, to confront witnesses against him and the 14th Amendment due process rights became complete when the criminal case against him was terminated in his favor

with charges being dismissed on May 26, 2021. *See McDonough v. Smith*, -- U.S. -

-; -- S.Ct. --; 2019 WL 2527474 (June 20, 2019).

209. Due to the conduct of Defendants, as set forth above, Plaintiff,

GILBERT POOLE, suffered the following injuries and damages:

    a. Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over 31 years, including significant time spent in solitary confinement;

    b. Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charges with First Degree Murder/Felony Murder, facing a sentence of Life in Prison without the possibility of parole; and being wrongfully convicted of crimes the Defendants knew he did not commit;

    c. Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

    d. Fright, shock, indignity, humiliation, outage, indignity and embarrassment of being wrongfully charged and imprisoned for murder;

    e. Loss of enjoyment of daily activities;

    f. Not being able to attend the funerals of family members, including both his parents;

    g. Physical injuries suffered in prison;

    h. Future medical expenses including psychiatric care;

    i. Loss of employment opportunity, past income and future earning capacity;

j.  Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, recreational activities, and personal expression;

k.  Many of Plaintiff's injuries and damages are likely to be permanent;

l.  Exemplary, compensatory, and punitive damages allowed under Michigan and Federal law;

m.  Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988;

n.  The costs and disbursements of this action pursuant to 42 U.S.C. §1920;

o.  All damages allowed under MCL 600.2907 and the common law of the State of Michigan, together with pre-judgment interest, costs and attorney fees allowed under state law; and

p.  Such other and further relief as appears just and proper.

**COUNT VI**
**14th AMENDMENT DUE PROCESS**
**"BRADY" VIOLATIONS BY DEFENDANTS RICHARD THOMPSON,**
**CHARLES SPIEKERMAN, & RHONDA ROHTBART**

210.  Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

211.  At all times, Plaintiff had a constitutional right, secured by the 14th Amendment, not to be deprived of due process as a result of the withholding of material exculpatory or impeachment evidence by a government officer.

212.   Defendants RICHARD THOMPSON, CHARLES SPIEKERMAN & RHONDA ROHTBART, deliberately and knowingly chose not to disclose material exculpatory and impeachment evidence in their files to the defendant in violation of their constitutional obligation under *Brady v Maryland*, 373 U.S. 83 (1963) and its progeny, which would have resulted in a finding of lack of probable cause at the preliminary exam or an acquittal at trial; such conduct constituting a claim for a due process "*Brady* violation" under the 14th Amendment.

213.   RICHARD THOMPSON, CHARLES SPIEKERMAN & RHONDA ROHTBART deliberately and knowingly chose not to disclose to the defense before trial the original composite drawings which were printed in the Oakland County Press shortly after the murder, and months before POOLE'S arrest.  The prosecutor alternatively misrepresented to the jury that a new composite drawing was the only one done in the case.

214.   Plaintiff's right to *Brady* evidence, and the court officer's constitutional duty to turn over material and apparent *"Brady"* evidence, was clearly established before June 6, 1989, when he was tried and convicted. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Moldowan v. City of Warren*, 578 F.3d. 351, 382 (6th Cir. 2009) (citing cases back to 1964).

215.   RICHARD THOMPSON & RHONDA ROHTBART'S knowing and intentional due process violations was a direct and proximate cause of  Plaintiff's

wrongful conviction and imprisonment from June 6, 1989, to his exoneration on

May 26, 2021; a period of 11,677 days; or 31 years, 11 months, 20 days; or 383

months and 20 days.

216.   The total time Plaintiff spent behind bars totaled 11,838 days; or 32

years, 4 months, 29 days; or 388 months and 29 days.

217.   Due to the conduct of Defendants, as set forth above, Plaintiff,

GILBERT POOLE, suffered the following injuries and damages:

    a.  Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over 31 years, including significant time spent in solitary confinement;

    b.  Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charges with First Degree Murder/Felony Murder, facing a sentence of Life in Prison without the possibility of parole; and being wrongfully convicted of crimes the Defendants knew he did not commit;

    c.  Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

    d.  Fright, shock, indignity, humiliation, outage, indignity and embarrassment of being wrongfully charged and imprisoned for murder;

    e.  Loss of enjoyment of daily activities;

    f.  Not being able to attend the funerals of family members, including both his parents;

    g.  Physical injuries suffered in prison;

h. Future medical expenses including psychiatric care;

i. Loss of employment opportunity, past income and future earning capacity;

j. Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, recreational activities, and personal expression;

k. Many of Plaintiff's injuries and damages are likely to be permanent;

l. Exemplary, compensatory, and punitive damages allowed under Michigan and Federal law;

m. Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988;

n. The costs and disbursements of this action pursuant to 42 U.S.C. §1920;

o. All damages allowed under MCL 600.2907 and the common law of the State of Michigan, together with pre-judgment interest, costs and attorney fees allowed under state law; and

p. Such other and further relief as appears just and proper.

## COUNT VII
## 14th AMENDMENT DUE PROCESS
## "BRADY" VIOLATIONS BY DEFENDANT MELINDA JACKSON

218.   Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

219.   At all times, Plaintiff had a constitutional right, secured by the 14th Amendment, not to be deprived of due process as a result of the withholding of material exculpatory or impeachment evidence by a government officer.

220.   Defendant JACKSON, deliberately and knowingly chose not to disclose material exculpatory and impeachment evidence in her files to the prosecutor or defense in violation of her constitutional obligation under *Brady v Maryland*, 373 U.S. 83 (1963) and its progeny, which would have resulted in a finding of lack of probable cause at the preliminary exam or an acquittal at trial; such conduct constituting a claim for a due process "*Brady* violation" under the 14th Amendment.

221.   JACKSON deliberately and knowingly chose not to disclose to the prosecutor or defense before trial that POOLE was excluded as the only foreign contributor to the blood found on the stones at the crime scene. MATHES affidavit for search warrant states:

> Affiant spoke with MELINDA JACKSON who indicated: 1. That she is employed at the Michigan State Police Crime Lab as a laboratory specialist and is an expert in making scientific comparisons of blood and hair samples. 2. That she *assisted* another specialist David Woodford in making his initial evaluation of the physical evidence in the Mejia homicide and she presently is in charge of the laboratory evaluation of the evidence. 3. That the blood on the stone recovered from Mejia's clothing was compared with the known sample of Meija's blood and they did not match. 4. *That if she was provided a whole blood sample from the suspect in this case she would be able to compare it with the blood on the stone recovered at the homicide*

*scene and determine whether Gilbert Poole Jr. was the source of the blood on the stone.*

JACKSON's statements helped form the basis of the search warrant and thus POOLE'S blood was obtained for analysis. JACKSON determined POOLE'S blood type to be Type AB, but did not compare it against the blood found on the stones.  Although JACKSON did not compare POOLE'S blood to the stones, as she stated she would in the Affidavit for Search Warrant, it is undoubtable she had access to the report generated by Woodford (as his assistant in the initial evaluation) identifying the stones as having a foreign blood type of type A. Therefore, in generating a report which did not indicate that POOLE was excluded as the contributor of the foreign blood sample on the stones, she knowingly withheld exculpatory evidence from the defense.

222.   Plaintiff's right to *Brady* evidence, and JACKSON'S constitutional duty to turn over material and apparent *"Brady"* evidence, was clearly established before June 6, 1989, when he was tried and convicted. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Moldowan v. City of Warren*, 578 F.3d. 351, 382 (6th Cir. 2009) (citing cases back to 1964).

223.   JACKSONS'S knowing and intentional due process violation was a direct and proximate cause of  Plaintiff's wrongful conviction and imprisonment from June 6, 1989, to his exoneration on May 26, 2021; a period of 11,677 days; or 31 years, 11 months, 20 days; or 383 months and 20 days.

224. The total time Plaintiff spent behind bars totaled 11,838 days; or 32 years, 4 months, 29 days; or 388 months and 29 days.

225. Due to the conduct of Defendants, as set forth above, Plaintiff, GILBERT POOLE, suffered the following injuries and damages:

    a. Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over 31 years, including significant time spent in solitary confinement;

    b. Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charges with First Degree Murder/Felony Murder, facing a sentence of Life in Prison without the possibility of parole; and being wrongfully convicted of crimes the Defendants knew he did not commit;

    c. Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

    d. Fright, shock, indignity, humiliation, outage, indignity and embarrassment of being wrongfully charged and imprisoned for murder;

    e. Loss of enjoyment of daily activities;

    f. Not being able to attend the funerals of family members, including both his parents;

    g. Physical injuries suffered in prison;

    h. Future medical expenses including psychiatric care;

    i. Loss of employment opportunity, past income and future earning capacity;

j. Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, recreational activities, and personal expression;

k. Many of Plaintiff's injuries and damages are likely to be permanent;

l. Exemplary, compensatory, and punitive damages allowed under Michigan and Federal law;

m. Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988;

n. The costs and disbursements of this action pursuant to 42 U.S.C. §1920;

o. All damages allowed under MCL 600.2907 and the common law of the State of Michigan, together with pre-judgment interest, costs and attorney fees allowed under state law; and

p. Such other and further relief as appears just and proper.

## COUNT VIII
## 14th AMENDMENT DUE PROCESS
## VIOLATIONS BY ALLAN J. WARNICK, D.D.S, RICHARD THOMPSON, CHARLES SPIEKERMAN, RHONDA ROHTBART

226. At all times, Plaintiff had a constitutional right, secured by the 14th Amendment, not to be deprived of due process by giving of manufactured or false testimony.

227. ALLAN J. WARNICK, D.D.S. was retained by the prosecution to give expert witness testimony in the field of Odontology. He was an agent of Oakland County at all relevant times.

228.   ALLAN J. WARNICK, D.D.S. deliberately and knowingly gave false testimony at trial when he gave expert forensic testimony regarding the identification of the defendant based upon a statistical analysis which had no scientific support.

229.   DR. WARNICK knowingly and deliberately gave false testimony at POOLE's trial when he testified that the "bitemark" found on the victim's body was consistent with POOLE'S dentition and that *the odds that two people would make the same bitemark is 2.1 billion to 1.*

230.   DR. WARNICK'S statistical claims were not supported by science and were knowingly false when made.

231.   DR. WARNICK was deliberately indifferent to GILBERT POOLE'S Constitutional rights.

232.   RICHARD THOMPSON, CHARLES SPIEKERMAN, RHONDA ROHTBART, as counsel for the people, knowingly and deliberately sponsored this statistical testimony which was not supported by scientific evidence, and thus suborned perjury from its expert witness.

233.   Dr. ALLEN WARNICK, at all relevant times was an agent of OAKLAND COUNTY.

234.   RICHARD THOMPSON, CHARLES SPIEKERMAN, RHONDA ROHTBART & DR. WARNICK'S knowing and intentional due process violations

as described above was a direct and proximate cause of Plaintiff's wrongful conviction and imprisonment from June 6, 1989, to his exoneration on May 26, 2021; a period of 11,677 days; or 31 years, 11 months, 20 days; or 383 months and 20 days.

235.   COUNTY OF OAKLAND further delayed pursuing a reversal in POOLE'S conviction in light of the knowledge that foundational evidence was invalid, unreliable and could not support a conviction.

236.   Plaintiff's total time spent behind bars in jail and prison totaled 11,838 days; or 32 years, 4 months, 29 days; or 388 months and 29 days.

237.   Plaintiff's cause of action to be free from false testimony became complete when the criminal case against him was terminated in his favor with charges being dismissed on May 26, 2021. *See McDonough v. Smith*, -- U.S. --; -- S.Ct. --; 2019 WL 2527474 (June 20, 2019).

238.   Due to the conduct of Defendants, as set forth above, Plaintiff, GILBERT POOLE, suffered the following injuries and damages:

   a. Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over 31 years, including significant time spent in solitary confinement;

   b. Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charges with First Degree Murder/Felony Murder, facing a sentence of Life in Prison without the possibility of parole; and being wrongfully convicted of crimes the Defendants knew he did not commit;

    c.  Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

    d.  Fright, shock, indignity, humiliation, outage, indignity and embarrassment of being wrongfully charged and imprisoned for murder;

    e.  Loss of enjoyment of daily activities;

    f.  Not being able to attend the funerals of family members, including both his parents;

    g.  Physical injuries suffered in prison;

    h.  Future medical expenses including psychiatric care;

    i.  Loss of employment opportunity, past income and future earning capacity;

    j.  Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, recreational activities, and personal expression;

    k.  Many of Plaintiff's injuries and damages are likely to be permanent;

    l.  Exemplary, compensatory, and punitive damages allowed under Michigan and Federal law;

    m.  Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988;

    n.  The costs and disbursements of this action pursuant to 42 U.S.C. §1920;

o. All damages allowed under MCL 600.2907 and the common law of the State of Michigan, together with pre-judgment interest, costs and attorney fees allowed under state law; and

p. Such other and further relief as appears just and proper.

## COUNT IX
## STATE LAW MALICIOUS PROSECUTION BY DEFENDANTS MATHES, SERNA, THOMPSON, SPIEKERMAN & ROHTBART

239. Plaintiff incorporates by reference each preceding paragraph as if fully set forth herein.

240. The underlying criminal proceedings against Plaintiff ultimately terminated in his favor with a dismissal of the charges in state court on May 26, 2021.

241. The criminal investigation and prosecution were undertaken without probable cause or good faith and with malice. They were not undertaken with the intention of bringing Plaintiff to justice for having committed the alleged murder. Instead, the individual Defendants acted to frame Plaintiff for the murder of Robert Mejia, where there was no evidence other than the multiple inconsistent statements made by his scorned ex-girlfriend utilizing evidence that was either fabricated or not proffered in good faith.

242. MATHES and SERNA deliberately and knowingly omitted material facts (that Connie Cook initially stated she could not remember when the murder

occurred and in her second statement, stated the murder occurred in January of 1988, the night of POOLE's birthday) in their warrant request to the warrant prosecutor and judge who signed the arrest warrant. The individual Defendants knew that absent the fabricated and undisclosed evidence, there was no evidence against Plaintiff to support probable cause for arrest or continued detention.

243.   MATHES, SERNA, THOMPSON, SPIEKERMAN & ROHTBART deliberately and knowingly fabricated evidence in order to secure a conviction by creating a composite sketch, not generated by any witness statements but instead generated from GILBERT POOLE'S drivers license photo after his arrest, which the prosecution purported to be the only composite sketch at trial.  The individual Defendants knew that absent the fabricated and undisclosed evidence, there was no evidence against Plaintiff to support probable cause for arrest or continued detention.

244.  As a direct and proximate result of Defendants' malicious prosecution, Plaintiff was charged and convicted of crimes he did not commit, causing them to suffer the special injuries and damages set forth above, as well as treble the amount of damages and expenses.

245.  Defendants, by their extreme and outrageous conduct, described above, maliciously caused arrest, prosecution without consent of GILBERT POOLE and as such, Plaintiff is entitled to treble damages under MCL 600.2907.

246.    Due to the conduct of Defendants, as set forth above, Plaintiff,

GILBERT POOLE, suffered the following injuries and damages:

a.  Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over 31 years, including significant time spent in solitary confinement;

b.  Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charges with First Degree Murder/Felony Murder, facing a sentence of Life in Prison without the possibility of parole; and being wrongfully convicted of crimes the Defendants knew he did not commit;

c.  Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

d.  Fright, shock, indignity, humiliation, outage, indignity and embarrassment of being wrongfully charged and imprisoned for murder;

e.  Loss of enjoyment of daily activities;

f.  Not being able to attend the funerals of family members, including both his parents;

g.  Physical injuries suffered in prison;

h.  Future medical expenses including psychiatric care;

i.  Loss of employment opportunity, past income and future earning capacity;

j.  Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal

fulfillment, sexual activity, family relations, recreational activities, and personal expression;

k.  Many of Plaintiff's injuries and damages are likely to be permanent;

l.  Exemplary, compensatory, and punitive damages allowed under Michigan and Federal law;

m. Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988;

n.  The costs and disbursements of this action pursuant to 42 U.S.C. §1920;

o.  All damages allowed under MCL 600.2907 and the common law of the State of Michigan, together with pre-judgment interest, costs and attorney fees allowed under state law;

p.  Treble damages; and

q.  Such other and further relief as appears just and proper.

## COUNT X
## 4th and 14th AMENDMENT "FABRICATION OF EVIDENCE BY DR. WARNICK, THOMPSON & SPIEKERMAN

247.  Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

248.  At all times, Plaintiff had a constitutional right, secured by the 4th and 14th Amendments, not to be seized and deprived of liberty as a result of fabrication of evidence by a government officer acting in an investigative capacity.

249.   At all times, Plaintiff had a constitutional right, secured by the 14th Amendment, not to be deprived of due process as a result of fabrication of evidence by a government officer, including a prosecuting attorney and/or a witness proffered by the prosecution.

250.   Plaintiff's constitutional 4th Amendment and due process rights to be free from illegal seizure and continued detention based upon fabrication of evidence by a government official acting in an investigatory capacity was clearly established before June 6, 1988, the earliest possible date for Defendants' conduct in this case. *Albright v. Oliver*, 510 U.S. 266, 274; 114 S. Ct. 807; 127 L.Ed.2d 114 (1994)(malicious prosecution of an individual and continued detention of an individual without probable cause clearly violate rights afforded by the Fourth Amendment, citing cases back to the 1940s); *See also Napue v. Illinois*, 360 U.S. 264, 269; 79 S.Ct. 1173 (1959) (14th Amendment right not to be deliberately subjected to trial based on false evidence is implicit in any concept of ordered liberty.")

251. DR. WARNICK deliberately and knowingly fabricated evidence when he gave false testimony at trial involving statistical data for identification of a Defendant without any scientific basis.

252. SPIEKERMAN and THOMPSON deliberately and knowingly fabricated evidence when they proffered Dr. Wanick's false testimony regarding statistical data for identification purposes at trial.

253. DR. WARNICK, SPIEKERMAN, and THOMPSON'S deliberate and knowing fabrication of evidence to continue POOLE'S detention caused a violation of his right to be free from illegal seizure and continued detention and resulted in his wrongful conviction and imprisonment from June 6, 1989, to his exoneration on May 26, 2021; a period of 11,677 days; or 31 years, 11 months, 20 days; or 383 months and 20 days.

254. Plaintiff's total time spent behind bars in jail and prison totaled 11,838 days; or 32 years, 4 months, 29 days; or 388 months and 29 days.

255. Plaintiff's cause of action for fabrication of evidence became complete when the criminal case against him was terminated in his favor with charges being dismissed on May 26, 2021. *See McDonough v. Smith*, -- U.S. --; -- S.Ct. --; 2019 WL 2527474 (June 20, 2019).

256. Due to the conduct of Defendants, as set forth above, Plaintiff, GILBERT POOLE, suffered the following injuries and damages:

    a. Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over 31 years, including significant time spent in solitary confinement;

    b. Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charges

with First Degree Murder/Felony Murder, facing a sentence of Life in Prison without the possibility of parole; and being wrongfully convicted of crimes the Defendants knew he did not commit;

c. Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

d. Fright, shock, indignity, humiliation, outage, indignity and embarrassment of being wrongfully charged and imprisoned for murder;

e. Loss of enjoyment of daily activities;

f. Not being able to attend the funerals of family members, including both his parents;

g. Physical injuries suffered in prison;

h. Future medical expenses including psychiatric care;

i. Loss of employment opportunity, past income and future earning capacity;

j. Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, recreational activities, and personal expression;

k. Many of Plaintiff's injuries and damages are likely to be permanent;

l. Exemplary, compensatory, and punitive damages allowed under Michigan and Federal law;

m. Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988;

n. The costs and disbursements of this action pursuant to 42 U.S.C. §1920;

o. All damages allowed under MCL 600.2907 and the common law of the State of Michigan, together with pre-judgment interest, costs and attorney fees allowed under state law; and

p. Such other and further relief as appears just and proper.

## COUNT XI
## STATE LAW CLAIMS OF GROSS NEGLIGENCE, AND/OR WANTON AND WILLFUL MISCONDUCT AGAINST ALL DEFENDANTS

257.   Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

258.   That Defendants' had knowledge of each and every factual allegation set forth above.

259.   That in undertaking and sponsoring the arrest, detainment, prosecution and conviction of GILBERT POOLE, Defendants owed a duty to Plaintiff to do so in a reasonable and prudent manner, to exercise due care and caution, and in such operation as the rules of the common law require, and in accordance with the customs, policies and procedures which applied.

260.   That Defendants breached each and every duty owed to Plaintiff.

261.   That notwithstanding the aforementioned duties, the Defendants undertook and sponsored the arrest, detainment, prosecution and conviction of GILBERT POOLE in an extremely careless, grossly negligent, reckless, and

wanton and willful manner, including but not limited to the allegations as set forth fully in counts I-IX of this complaint.

262.   That the above-described actions and/or inactions violated MCL 691.1407 in that they amounted to gross negligence, specifically conduct so reckless as to demonstrate a substantial disregard for whether an injury resulted to Plaintiff.

263.   That Defendants are not entitled to governmental immunity based upon their actions.

264.   That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff sustaining the injuries and damages as set forth above.

265.   Due to the conduct of Defendants, as set forth above, Plaintiff, GILBERT POOLE, suffered the following injuries and damages:

   a.   Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over 31 years, including significant time spent in solitary confinement;

   b.   Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charges with First Degree Murder/Felony Murder, facing a sentence of Life in Prison without the possibility of parole; and being wrongfully convicted of crimes the Defendants knew he did not commit;

   c.   Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

d. Fright, shock, indignity, humiliation, outage, indignity and embarrassment of being wrongfully charged and imprisoned for murder;

e. Loss of enjoyment of daily activities;

f. Not being able to attend the funerals of family members, including both his parents;

g. Physical injuries suffered in prison;

h. Future medical expenses including psychiatric care;

i. Loss of employment opportunity, past income and future earning capacity;

j. Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, recreational activities, and personal expression;

k. Many of Plaintiff's injuries and damages are likely to be permanent;

l. Exemplary, compensatory, and punitive damages allowed under Michigan and Federal law;

m. Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988;

n. The costs and disbursements of this action pursuant to 42 U.S.C. §1920;

o. All damages allowed under MCL 600.2907 and the common law of the State of Michigan, together with pre-judgment interest, costs and attorney fees allowed under state law; and

p.  Such other and further relief as appears just and proper.

## COUNT XII
## COMMON LAW INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY ALL DEFENDANTS

266.  Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

267.  Defendants, by their extreme and outrageous conduct, described above, demonstrated such intent and/or recklessness as to cause Plaintiff severe emotional distress.

268.  Defendants conduct can only be described as atrocious, outrageous, and utterly intolerable in a civilized society.

269.  Defendants conduct meets the elements of the common law claim for Intentional Infliction of Emotional Distress.

270.  Due to the conduct of Defendants, as set forth above, Plaintiff, GILBERT POOLE, suffered the following injuries and damages:

   a.  Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over 31 years, including significant time spent in solitary confinement;

   b.  Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charges with First Degree Murder/Felony Murder, facing a sentence of Life in Prison without the possibility of parole; and being wrongfully convicted of crimes the Defendants knew he did not commit;

c.  Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

d.  Fright, shock, indignity, humiliation, outage, indignity and embarrassment of being wrongfully charged and imprisoned for murder;

e.  Loss of enjoyment of daily activities;

f.  Not being able to attend the funerals of family members, including both his parents;

g.  Physical injuries suffered in prison;

h.  Future medical expenses including psychiatric care;

i.  Loss of employment opportunity, past income and future earning capacity;

j.  Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, recreational activities, and personal expression;

k.  Many of Plaintiff's injuries and damages are likely to be permanent;

l.  Exemplary, compensatory, and punitive damages allowed under Michigan and Federal law;

m.  Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988;

n.  The costs and disbursements of this action pursuant to 42 U.S.C. §1920;

o. All damages allowed under MCL 600.2907 and the common law of the State of Michigan, together with pre-judgment interest, costs and attorney fees allowed under state law; and

p. Such other and further relief as appears just and proper.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff, GILBERT POOLE, respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, jointly and severally, and award an amount in excess of One Hundred Million ($100,000,000.00) Dollars exclusive of costs, interest, attorney fees, as well as treble, punitive and exemplary damages, 42 USC 1988 damages, and all other damages allowable under federal and state law.

Respectfully submitted,

**Fieger, Fieger, Kenney & Harrington, P.C.**

*/s/ Kevin C. Riddle*
Kevin C. Riddle P57435
19390 West Ten Mile Road
Southfield, MI 48075-2463
(248) 355-5555
k.riddle@fiegerlaw.com

Dated:  May 23, 2023

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

GILBERT POOLE,

           Plaintiff,

vs.

           Case No.

           Hon.

CITY OF PONTIAC, a Municipal Corporation,
OFFICER SANTIAGO SERNA,
OFFICER OLIVER MATHES, III,
COUNTY OF OAKLAND, a Municipal Corporation
RICHARD THOMPSON,
CHARLES SPIEKERMAN,
RHONDA C. KLINE f/k/a RHONDA C. ROHTBART,
MELINDA JACKSON &
ALLAN J. WARNICK, D.D.S.,

Individually,

           Defendants.

_____

JAMES J. HARRINGTON, IV (P65351)
KEVIN C. RIDDLE (P57435)
Fieger, Fieger, Kenney & Harrington, P.C.
Attorneys for Plaintiff
19390 West Ten Mile Road
Southfield, MI 48075
(248) 355-5555 / (248) 355-5148 - Fax
k.riddle@fiegerlaw.com
_____

## DEMAND FOR TRIAL BY JURY

      NOW COMES Plaintiff, GILBERT POOLE, by and through his attorneys,

FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., and hereby demands trial

by jury in the above-captioned matter.

{01430683.DOCX}

Respectfully submitted,

**Fieger, Fieger, Kenney & Harrington, P.C.**


*/s/ Kevin C. Riddle*
Kevin C. Riddle P57435
19390 West Ten Mile Road
Southfield, MI 48075-2463
(248) 355-5555
k.riddle@fiegerlaw.com

Dated:  May 23, 2023